AUSA: Elizabeth Young      Telephone: (313) 226-9631

AO 91 (Rev. 08/09) Criminal Complaint   SEALED MATTER   Special Agent : Aaron M. Erkkinen      Telephone: (313) 965-5504

# UNITED STATES DISTRICT COURT
for the
Eastern District of Michigan

27

United States of America,

       Plaintiff,

v.

Laran Lerner
Mohamad Bazzi

       Defendant(s).

Case: **2:15−mj−30286**
Assigned To : **Unassigned**
Assign. Date : **6/17/2015**
Description: **RE: SEALED MATTER (EOB)**

---

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

On or about the date(s) of <u>January 1, 2008 to present</u>, in the county of <u>Wayne</u> in the <u>Eastern</u> District of <u>Michigan</u>, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, U.S.C. Section 1347 (Lerner/Bazzi) | Health Care Fraud |
| Title 18, U.S.C. Section 1349 (Lerner/Bazzi) | Conspiracy to Commit Health Care Fraud |
| Title 18 U.S.C. Section 1956 (Bazzi) | Money Laundering |
| Title 31, U.S.C. Section 5324(a)(3) (Lerner) | Structuring |

This criminal complaint is based on these facts:

Please see attached Affidavit.

FILED
JUN 17 2015
CLERK'S OFFICE
U.S. DISTRICT COURT

☑   Continued on the attached sheet.

_____
*Complainant's signature*

<s>Aaron Erkkinen</s>   STEVEN WARREN, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   6/17/15

City and state:   Detroit, Michigan

_____
*Judge's signature*

Hon. David R. Grand, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

The undersigned, Steven Warren, being first duly cautioned and sworn, hereby deposes and states the follows:

### I. Affiant's Background and Qualifications

1.  I am Special Agent with the United States Department of Health and Human Services, Office of Inspector General, Office of Investigations ("HHS-OIG-OI"), and have been employed in this capacity since July 2010. I am a law enforcement office of the United States and was duly appointed according to law within the meaning of 18 U.S.C. § 2510 (7), in that I am empowered by law to conduct investigations and to make arrests for federal felony offenses.

2.  As part of my duties as a Special Agent with HHS-OIG-OI, I am authorized to conduct investigations, audits and inspections in connection with the administration and enforcement of laws, regulations, orders, contracts and programs in which the United States Department of Health and Human Services (HHS) is, or may be, a party of interest, and perform other duties on behalf of the Secretary of HHS. My chief responsibility is the investigation of fraud involving federally-funded health care programs.

3.  I have received basic criminal investigator training as well as specialized training in the investigation of fraud and financial crimes. I was previously employed as a Special Agent with the Ohio Attorney General's Office, Medicaid Fraud Control Unit for approximately 24 months. My primary responsibility during this period totaling over seven (7) years has been the investigation of health care fraud against the federally-funded health care programs commonly known as Medicare and Medicaid.

4.  I have knowledge of the facts set forth in this affidavit as a result of my participation in an investigation pertaining to the submission of false and fraudulent claims to Medicare for prescription drugs and medical services

1

that were not provided and/or not medically necessary by Dr. Laran Lerner ("LERNER"). Mohamad Bazzi ("BAZZI"), and others not named. Information was provided to me by other law enforcement agencies including the Federal Bureau of Investigation ("FBI") and the Internal Revenue Service, Criminal Investigation ("IRS-CI"). Information pertinent to this investigation was also provided by Cahaba Safeguard Administrators ("Cahaba"), the zone program integrity contractor for the HHS until May 2015 and Health Integrity, the Medicare drug integrity contractor for HHS – both responsible for performing investigations and audits designed to protect the Medicare program from fraud, waste, and abuse.

5.   The information contained herein is known to me through my training and experience, observations as a law enforcement officer, personal knowledge obtained during the investigation, the review and analysis of data and documentation, and interviews of people having direct or indirect knowledge of these events, among other sources. This affidavit is being submitted for the limited purpose of displaying probable cause in support of the application for a search warrant and, as such, does not include each and every fact known to me or others about this investigation involving LERNER, BAZZI, and employees of GDPTR and Specialized Pharmacy Solutions, Inc., doing business as Advanced Pharmacy Services ("APS").

6.   Based upon the information set forth below, I have reason to believe and do believe that certain evidence supporting violations of the following federal criminal statutes is presently being maintained or stored at the Subject Premise:

   a.   Title 18, U.S.C. Section 1347 (health care fraud);

   b.   Title 18, U.S.C. Section 1349 (health care fraud conspiracy);

   c.   Title 18 U.S.C. Section 1956 (money laundering);

2

    d.  Title 31, U.S.C. Section 5324(a)(3) (structuring).

## II. <u>Summary of the Allegations</u>

7.    Specifically, the evidence shows that LERNER, a physician with multiple practice locations including one located at 22100 Greenfield Road, wrote prescriptions to patients for unnecessary expensive name brand drugs, as well as controlled substances, and told the patients to fill those prescriptions at APS.  At least one patient was paid cash by an APS employee to obtain additional unnecessary prescriptions from LERNER that were never dispensed to the patient.  LERNER benefitted from the scheme by billing Medicare for the office visits to those patients.

8.    LERNER is licensed to practice medicine in the State of Michigan and operates a Medicare certified medical clinic known as GDPTR.

9.    LERNER operated a walk-in clinic in the same building as APS at 22100 Greenfield Road ("Greenfield Road Clinic"), although LERNER never disclosed the existence of the Greenfield Road Clinic to Medicare.  The patients LERNER saw at the Greenfield Road Clinic were billed under his GDPTR provider number, which is listed at the Merriman Road address.

10.    The evidence also shows that BAZZI, a licensed pharmacist, bills Medicare for expensive name brand drugs that are not dispensed. BAZZI owned and operated a number of pharmacies in the Detroit area, including APS.  APS was located at 22100 Greenfield Road in Oak Park, Michigan, the current location of Pharmacy 1. Medicare beneficiaries that visited APS received cash and controlled substances in exchange for providing APS with their prescriptions for expensive name brand drugs that the patients did not need or want, and were often not dispensed.  APS then billed Medicare for those expensive name brand drugs without actually buying or dispensing the drugs

3

to the patients, resulting in millions of dollars of loss to the Medicare program and over a million dollars in profit to BAZZI.

11.   After law enforcement officers interviewed several Medicare beneficiaries, APS closed in or about January 2014, it reopened several months later as Pharmacy 1. On its face, APS and Pharmacy 1 appear to have two separate owners but in fact have the same beneficial owner, employees, and its general operation remained the same.

### III.   The Medicare Program

12.   The Medicare program is a federally-funded health care program providing benefits to persons who were over the age of 65 or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services (CMS), a federal agency within HHS. Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

13.   Medicare is a "health care benefit program," as defined by Title 18, U.S.C. Section 24(b).

14.   Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D).

15.   This investigation involves medical services provided in an office setting which is covered by Medicare Part B. Medicare Part B helps pay the cost of physician services, medical equipment and supplies, and other health services and supplies not covered by Part A. The services must be medically necessary and provided by licensed physicians or otherwise qualified medical professionals

16.   Medicare Part B claims are processed and paid by private insurance organizations, known as fiscal intermediaries, who contract with CMS to administer there specific part of the Medicare program.

4

17.  This investigation also involves prescription medications that are covered by Medicare Part D which subsidizes the cost of prescription drugs for Medicare beneficiaries in the United States.  Beneficiaries enrolled in Medicare drug plans, which are operated by private companies approved by Medicare.  Those companies are often referred to as drug plan sponsors.  A beneficiary in a Medicare drug plan could fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription.

18.  A pharmacy can participate in Medicare Part D by entering a retail network agreement directly with a plan or with one or more Pharmacy Benefit Managers ("PBMs").  A PBM acts on behalf of one or more Medicare drug plans. Through a plan's PBM, a pharmacy can join the plan's network. When a Medicare Part D beneficiary presents a prescription to a pharmacy, the pharmacy submits a claim either directly to the plan or to a PBM that represents the beneficiary's Medicare drug plan.  The plan or PBM determines whether the pharmacy is entitled to payment for each claim and periodically pays the pharmacy for outstanding claims. The drug plan's sponsor reimburses the PBM for its payments to the pharmacy.

19.  Medicare, through CMS, compensates the Medicare drug plan sponsors and pays the sponsors a monthly fee for each Medicare beneficiary of the sponsors' plans.  Such payments are called capitation fees.  The capitation fee is adjusted periodically based on various factors, including the beneficiary's medical conditions.  In addition, in some cases where a sponsor's expenses for a beneficiary's prescription drugs exceed that beneficiary's capitation fee, Medicare reimburses the sponsor for a portion of those additional expenses.

20.  By becoming a participating provider in Medicare, enrolled providers agree to abide by the policies and procedures, rules, and regulations governing

5

reimbursement.   To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies and procedures, rules, and regulations, issued by CMS and its authorized agents and contractors.

## IV.   Background

*LERNER*

21.   GDPTR was incorporated on or about April 13, 1994 as a domestic professional service corporation and the address listed for GDPTR is 1678 Merriman Road, Westland, Michigan. LERNER is listed as the owner of GDPTR on corporate documents.   The Michigan Department of Licensing and Regulatory Affairs lists several previously assumed names including: Blue Dolphin Physical Therapy, Tri-State Pharmaceuticals, Orthopedic Rehabilitation and Hand Therapy, Orthopedic Physical Therapy, Walk-In Medical Center, Warren Physical Therapy and Rehabilitation, P.C., Oak Park Physical Therapy, and Merriman Physical Therapy and Rehabilitation, Inc.

    a.   According to Medicare enrollment records, LERNER is listed as the beneficial and sole owner of GDPTR as of April 13, 1994.   GDPTR was assigned Medicare provider identification number 0N86700 on or about November 20, 2003.

    b.   LERNER has been licensed in the State of Michigan as an Osteopathic Physician since in or about August 1983 and is assigned medical license number 5101008800.

    c.   Between on or about January 1, 2008 and on or about May 30, 2015, LERNER through GDPTR billed Medicare approximately $8.7 million and was paid approximately $2.4 million.

d. LERNER is a frequent prescriber of expensive name brand drugs, causing the Medicare Part D program to pay approximately $9 million in Part D claims since January 1, 2013, as a result of his prescriptions. LERNER ranks within the top 10 in several expensive non-controlled medications in the State of Michigan:

| Non-Controlled Medication | Ranking in Michigan 2011 | Ranking in Michigan 2012 | Ranking in Michigan 2013 | Ranking in Michigan 2014 |
|---|---|---|---|---|
| Celebrex | 7 | 1 | 1 | 2 |
| Lidoderm | 3 | 2 | 2 | 1 |
| Cymbalta | 4 | 1 | 2 | 4 |
| Spiriva | 1 | 1 | 2 | 6 |

22.   As of 2013, Celebrex is billed at approximately $177.86, Lidoderm is billed at approximately $266.96, Cymbalta is billed at approximately $204.61, and Spiriva is billed at approximately $289.85.

23.   LERNER also prescribes a significant amount of controlled substances, prescribing 535,584 units of Schedule II-V controlled in 2013 alone. In one month, January 2013, Dr, Lerner prescribed 15,401 units of Schedule II drugs, such as Oxycodone, which averages 496 units per day. In total, LERNER prescribed 41,901 units of controlled substances (Schedule II-IV) in January 2013, averaging 1,351 units of controlled substances per day.

*Advanced Pharmacy Services*

24.   APS was incorporated on or about June 4, 2003, and according to the 2005 Annual Report filed on or about April 1, 2005, BAZZI assumed ownership of APS and was listed as the president, secretary, treasurer, and resident

7

agent of APS. In 2011, the annual report listed Moe Baydoun ("Baydoun") as the president, secretary, treasurer, and resident agent of APS, which he remained until the closure of APS in 2014. Based on bank record and witness interviews, Baydoun was an employee of APS and BAZZI was the beneficial owner of APS and sole signatory on the APS bank account until APS closed in 2014.

25. According to Medicare enrollment records, BAZZI was listed as the sole owner of APS as of May 11, 2005, with no change since then. APS was assigned Medicare provider identification number 4972980001 on or about June 21, 2004. Baydoun was never listed on the Medicare enrollment records.

26. BAZZI has been licensed in the State of Michigan as a Pharmacist since in or about January 1997 and is assigned pharmacist license number 5302029441.

27. Pharmacist 1 (P-1) was listed as the registered pharmacist at APS, along with BAZZI.

28. On or about December 14, 2005, BAZZI signed a consent order and stipulation with the Michigan Board of Pharmacy for having unmarked plastic bags of prescription medications and manufacturer samples of name brand medications at APS. BAZZI was fined and put on probation.

29. Between on or about January 1, 2008 and on or about December 27, 2013, APS was paid approximately $7.3 million for claims submitted to Medicare Part D. Of the total paid to APS, $4.2 million (or 57%) was prescribed by LERNER. Based on my training and experience, a pharmacy having a large percentage of their prescriptions coming from one physician is an indicator of fraud.

8

30. APS deactivated its Medicare provider number on or about March 13, 2013 but continued to submit claims to Medicare through on or about December 27, 2013.

## V. <u>General Health Care Fraud Scheme</u>

31. Law enforcement officers initiated this investigation based upon an analysis of Medicare claims data for LERNER. The information analyzed indicated LERNER was billing in amounts that made him a statistical outlier with respect to medical services and his pattern of prescribing expensive non-controlled medications.

32. A Confidential Human Source ("CHS") and Medicare beneficiaries were interviewed and told law enforcement officers that LERNER was providing medically unnecessary services and instructing Medicare beneficiaries to fill their prescriptions at APS located in the same building as LERNER's secondary practice location at 22100 Greenfield Road, Oak Park, Michigan, which was not disclosed to Medicare. LERNER received monthly rental payments from APS as well as Pharmacy 1.

33. APS bills Medicare Part D for expensive medications primarily prescribed by LERNER that were not medically necessary and not dispensed. In some instances, APS paid Medicare beneficiaries for prescriptions containing medications that were not dispensed but were ultimately billed to Medicare.

34. CHS and Medicare beneficiaries revealed that after APS closed it reopened several months later as Pharmacy 1 and continued to operate in the same fashion as APS.

9

## VI.    Wholesale Drug Distribution Reconciliation

35.    Financial records for APS revealed that BAZZI through APS purchased his inventory of medications from two separate wholesale drug distributors; McKesson Corporation ("McKesson") and The Harvard Drug Group ("Harvard").

36.    Law enforcement officers obtained the order history and due diligence file for APS from McKesson and Harvard.

37.    In 2007, BAZZI signed contracts to purchase medications from McKesson and Harvard and was the point of contact with the sales representatives about purchases and returns made by APS.

38.    In September 2010, BAZZI also signed an affidavit with Harvard stating that he did not dispense controlled substances provided by a pain clinic and that, if he did, he would verify that the controlled substances were issued for a legitimate medical purpose.

39.    September 25, 2013, BAZZI signed another affidavit for an onsite inspection from Harvard stating that he was familiar with the records kept at APS, that inventory was conducted on a daily basis, and that only 20 percent of the inventory was for controlled substances.

40.    Recorded phone calls in 2013, between a McKesson sales representative and BAZZI, also show that BAZZI negotiated the purchase of medications from McKesson for APS.

41.    Health Integrity conducted an analysis of the wholesale drug distribution records received from McKesson and Harvard for APS and compared those records to the Medicare Part D claims submitted by APS for the period starting in or about January 2008 and in or about December 2013.   The purpose of the analysis was to verify if APS had sufficient purchases for the medications APS billed to Medicare Part D.   The analysis included the top

10

31 drug names (for a total of 81 drugs including various dosage strengths) allegedly dispensed by APS. The results of the analysis showed a significant amount of medication being billed to Medicare Part D with no record of a purchase from the wholesale drug distributors. Those medications include but are not limited to the following: Spiriva Cap Handihaler, Lidoderm, Advair Disku, Nexium, Cymbalata, Celebrex, Abilify, Seroquel, Singulair, and Lovaz.

42.   The analysis revealed that from on or about January 2, 2008 to on or about December 27, 2013, APS was paid approximately $7.4 million in Medicare Part D claims for medications allegedly dispensed to Medicare beneficiaries. Approximately $4.7 million of the total amount paid to APS was for the medications of interest and were included in the analysis conducted by Health Integrity. The analysis revealed APS could not account for $3.5 million worth of medications paid by Medicare Part D. In other words, APS did not purchase a large portion of the medications that were billed to Medicare Part D.

43.   The top 10 medications of interest represent 58% or approximately $2 million of the total approximate dollar loss:

| Drug Name/Strength | Qty Purchased | Qty Billed | Shortage | Approx. $ Loss | Prescribed by LERNER |
|---|---|---|---|---|---|
| Spiriva Cap Handihlr | 11,640 | 63,660 | 52,020 | $388,689.53 | $378,500.97 |
| Lidoderm Dis 5% | 6,870 | 57,300 | 50,430 | $374,782.14 | $314,105.75 |
| Advair Disku Aer 250/50 | 20,040 | 87,030 | 66,990 | $248,909.52 | $191,499.19 |
| Nexium Cap 40mg | 17,940 | 54,120 | 36,180 | $218,585.24 | $197,429.72 |
| Cymbalta Cap 60mg | 10,230 | 40,200 | 29,970 | $172,186.41 | $212,982.44 |

11

| Celebrex Cap 200mg | 5,900 | 42,754 | 36,854 | $171,692.26 | $160,559.40 |
| Abilify Tab 20mg | 660 | 4,710 | 4,050 | $123,663.77 | $138,621.06 |
| Seroquel Xr Tab 300mg | 540 | 8,895 | 8,355 | $117,233.15 | $90,053.15 |
| Singular Tab 10mg | 11,250 | 37,704 | 26,454 | $114,085.27 | $111,031.61 |
| Lovaza Cap 1gm | 4,680 | 72,030 | 67,350 | $111,306.75 | $106,696.94 |

44.  BAZZI was the only signatory on the APS bank account where the Medicare money was deposited.

45.  Evidence shows BAZZI attempted to return the medications he purchased from McKesson and Harvard.  A representative from McKesson, BAZZI's primary source of medications, emailed BAZZI on or about June 13, 2008, and warned him he had a high rate of returns and could no longer return items that were not supported by a McKesson invoice or in excess of 2 percent of his prior month's sales.

46.  Based on my training and experience, medication returns can be a sign fraud in pharmacy schemes because the owner will often buy a small amount of product in anticipation of an audit to make it appear as though that medication is being dispensed.  In 2010, BAZZI began to return medications he purchased from McKesson to National Pharmaceutical Return, a company that buys overstock medications. BAZZI received over $60,000 from medications he returned.   BAZZI's returns included Lidoderm, Celebrex, and Advair, the same medications he was overbilling to Medicare. These returns are not yet reflected in the inventory reconciliation, which will result in a higher shortage and dollar loss.

12

## VII.   Witness Interviews

47.   Agents interviewed multiple beneficiaries seen by LERNER who confirmed generally that they were written medically unnecessary prescriptions for expensive non-controlled medications, told to fill them at APS, and never received the prescribed drugs. A review of their Medicare billing data from 2009 to 2014 confirms that Medicare was billed and often paid for these medications.

48.   On or about September 19, 2013, law enforcement officers interviewed Medicare beneficiary JW who noted the following, among other things:

   a. JW was a patient of LERNER starting in approximately 2007. JW was referred to LERNER by a known patient recruiter. JW saw LERNER at his Greenfield Road office, where LERNER writes him/her prescriptions.

   b. JW stated that he/she has never received a prescription for Lidoderm from LERNER. APS billed Medicare thirty-eight (38) different times for Lidoderm which listed LERNER as the prescribing physician.

48.   On or about September 19, 2013, law enforcement officers interviewed Medicare beneficiary WL who noted the following, among other things:

   a. WL was a patient of LERNER starting in approximately 2003. WL saw LERNER at his Greenfield Road office on Fridays.

   b. WL last saw LERNER on September 6, 2013, and denied getting any prescriptions for Lidoderm patches. APS was paid for a single 30-day count of Lidoderm patches prescribed by LERNER on September 6, 2013.

49.   On or about November 1, 2013, law enforcement officers interviewed Medicare beneficiary ER who noted the following, among other things:

13

a. ER was a patient of LERNER and admitted to being paid $250 by a pharmacy technician (PT-1) at APS to obtain prescriptions from LERNER for Lidoderm patches, Celebrex, Abilify, Desoximetasone, Azor, Carisoprodol, Cymbalta, and Montelukast Sodium that he/she never received from APS.

b. ER last saw LERNER on October 23, 2013 and indicated the visit lasted five minutes and then ER received prescriptions for the unnecessary medications.

50. On or about November 1, 2013, law enforcement officers interviewed Medicare beneficiary SR, who noted the following, among other things:

a. SR was referred to LERNER's office by Medicare beneficiary ER; ER told SR that he/she would get paid if SR filled the prescriptions at APS.

b. SR went to LERNER's office to receive prescriptions for controlled substances and was instructed to fill his/her prescriptions at APS.

c. In addition to filling the controlled prescriptions at APS, an unidentified individual at APS would give SR a list of non-controlled medications and SR would take the list to LERNER's office where LERNER's nurse would write out the medications and then LERNER would sign the prescriptions. SR would receive the prescriptions for those medications and take them back to APS where the same unknown individual would give SR $150 and not dispense any of the medications to the SR. SR later said LERNER told him/her to take the prescriptions to APS.

d. SR identified the following medications from LERNER that were billed to Medicare Part D but never received: Lidoderm, Lovaza, Zetia, Nexium, Crestor, Amitiza, Singular, and Advair.

14

    e. SR also received controlled substances from LERNER including a muscle relaxer known as Soma, and admitted to selling it for $1 a pill.

51.    On or about December 11, 2013, law enforcement officers interviewed Medicare beneficiary FS who noted the following, among other things:

    a. LERNER wrote FS prescriptions for Lidoderm that he/she did not need; FS gave the prescriptions for the Lidoderm to the pharmacist at APS at the same time he/she filled other controlled substances prescriptions from LERNER. FS did not receive the Lidoderm from APS.

    b. LERNER prescribed Lidoderm to FS on at least fifty-three (53) different occasions totaling $11,637.66 in Medicare Part D reimbursement for APS.

52.    On or about May 27, 2015, law enforcement officers interviewed Medicare beneficiary CA who noted the following, among other things:

    a. CA was a patient of another physician ("Dr. A.J.") located in the same building as APS and LERNER's office.

    b. CA filled prescriptions from Dr. A.J. at APS, and received Medicare Summary Notices ("MSN") for medications billed to Medicare that he/she was not prescribed, including Celebrex, Lyrica, and Lidoderm.

    c. CA complained to both the pharmacy technicians at APS and Dr. A.J., but nobody did anything about his/her complaint.

53.    Evidence from another case demonstrates that LERNER is willing to sign off on unnecessary medical services or prescriptions in order to have the opportunity to bill for patients brought to him through health care fraud schemes. A recruiter who is a cooperating defendant in another case used LERNER to sign off on home health referrals for his/her patients. The recruiter picked LERNER up at GDPTR and drove him to his/her patients'

15

houses, where LERNER prescribed pain killers and anti-inflammatories and almost always referred the patient to a home health care company of the recruiter's choosing. The recruiter received kickbacks from the home health care companies and LERNER billed Medicare for the home visits to the recruiter's patients. On two occasions, LERNER accidentally referred the recruiter's patients to a company where the recruiter was not on the payroll and made it up to the recruiter by paying him/her $500 for the mistake. According to the recruiter, his/her patients saw LERNER because they wanted drugs. Since 2006, LERNER's home health care referrals have resulted in approximately $8.1 million in home health payments by Medicare.

## VIII. Recordings with Confidential Human Source

54. On two separate occasions, once in January 2014 and once in January 2015, a CHS accompanied Medicare beneficiaries to LERNER's office and recorded the visits with Medicare patients MH and HW at LERNER's office at the 22100 Greenfield Road location. That location operated as a walk-in clinic, is first come first serve and crowded with patients.

55. Both recordings show LERNER: 1) quickly asking the patients' questions about whether they are in pain, dictating various diagnoses that aren't supported by an examination to the nurse in the room; 2) making the patient undergo a nerve conduction test, and; 3) coming back into the room to prescribe a variety of name brand drugs and pain killers.

56. For example, in January 2014, Medicare beneficiary MH told LERNER in that he/she had a back surgery in 2005 and 2006 and LERNER dictated to the nurse that MH had "severe back pain" and had difficulty bending and walking without any type of examination.

16

57. Next, LERNER asked MH if he/she wanted to go to physical therapy (and similarly asked HW if he/she wanted to come in for physical therapy in his office or if he/she wanted home health care to come to his/her house).

58. LERNER then told MH that he/she had to have nerve conduction studies on his/her arms and legs at each appointment and that, if he/she didn't want it on the next visit, they could just perform the test more "gently". LERNER also billed Medicare for x-rays on MH's hip and sacroiliac joint even though there was nothing during the examination to support the need for those tests. Based on my experience and knowledge, physician diagnostic tests and nerve conduction studies can greatly increases Medicare reimbursement for a physician. For example, on this visit for MH, LERNER billed Medicare $370 for the office visit; however, LERNER was able to bill $2,895.40 for the nerve conduction studies.

59. LERNER came back into the examination room and called out a laundry list of medications to MH, from acid reflux medication to inhalers, and asked the patients if they wanted those medications without making any diagnoses. LERNER wrote prescriptions for MH for the same medications that were being billed but not dispensed by APS – including Lidoderm, Prilosec, Celebrex, and Cymbalta.

60. Finally, LERNER asked MH point blank which pain medication he/she wanted and in what dosage, and then wrote him/her a prescription for the painkiller he/she wanted, which was Lortab.

61. At one point during LERNER's visit with MH, another agitated patient was yelling profanities outside the examination room and telling the nurses his identification was at home and LERNER told the nurse to "give him his stuff, let him go" and when the nurse came back and asked LERNER when he wanted "this nut to come back," LERNER said "one week."

17

62.   In January 2015, LERNER performed a very similar exam on HW, where he made diagnoses of injuries that were not supported by his examination, told him/her to have a nerve conduction test, and then prescribed him/her a number of name brand medications before asking him/her what type of pain killer he/she wanted.   LERNER then asked HW if he/she wanted his/her medications delivered or if he/she wanted to pick them up at Pharmacy 1, the pharmacy that agents believe is operating the same fraud scheme by the same individuals from APS.

### IX.   Complaints to the Medicare Contractor

63.   In January 2013, Express Scripts, a prescription drug plan that contracts with Medicare to provide the prescription medications under the Medicare Part D program, discovered that APS billed one of its beneficiaries, AS, for prescription drugs from LERNER that were not dispensed by APS.   Express Scripts attempted to locate AS and found that AS could not be tracked down at his listed address.   APS billed Medicare for seventeen (17) prescriptions purportedly dispensed to AS and prescribed by LERNER, for medications such as Advair and Cymbalta.

64.   Another Medicare beneficiary, BM, complained to the Medicare contractor in 2012 that he/she received MSNs for medications purportedly prescribed by LERNER and filled at APS.   BM never received those prescriptions because he/she was living in Florida at the time.   LERNER also billed Medicare for seven different office visits and various diagnostic tests purportedly given to BM when he/she was living in Florida.

### X.   Financial Analysis (Money Laundering and Structured Transactions)

*Structuring – LERNER*

65.   Between on or about December 10, 2010 and the present, LERNER and others not named, structured transactions with domestic financial institutions

18

by breaking them into cash deposits at or below $10,000 to avoid the currency transaction requirement in violation of Title 31, U.S.C. Section 5324(a)(3) (Structuring Currency Transactions to Evade a Filing Requirement); there is evidence to show that LERNER caused or attempted to cause a domestic financial institution to fail to file a Currency Transaction Report ("CTR") by splitting currency transactions into amounts below $10,000, which transactions, when aggregated, exceeded $10,000 in a single day in violation of Title 31, U.S.C. Section 5324(a)(1) (Causing or Attempting to Cause a Financial Institution to Fail to File a Currency Transaction Report); and that there is evidence to believe that LERNER engaged in a conspiracy to commit the aforementioned violations in violation of 18 U.S.C. § 1347.

    a.  Pursuant to Title 31, U.S.C. Section 5313, and regulations thereunder, including 31 C.F.R. Sections 103.22, 103.27 and 103.28, domestic financial institutions are generally required to prepare and submit Currency Transaction Reports (CTR's) to report large cash transactions, consisting of transactions involving over $10,000 in currency or other monetary instruments, every time they occur at the bank. There are some exceptions for qualifying businesses that are exempt and government agencies. It is the financial institution that is required to prepare and submit the CTR. In order to complete the CTR form, however, the financial institution is required to verify and record the name and address of the person presenting a transaction, and the identity, account number, and the social security number or taxpayer identification number, if any, of any person for whom a transaction is to be effected. This verification must be made with some identity documents, such as a driver's license or passport.

These CTR rules apply to the deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institutions, which involves a transaction in currency, bank checks, cashier's checks, money orders, and traveler's checks of more than $10,000.

b. It is a felony under 31 U.S.C. § 5324 (a)(3) and (d) to structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions.   Section 5324(a)(3) requires proof that the defendant act with the intent to evade the CTR reporting requirement discussed above, but it does not require proof that the defendant act with knowledge that his conduct was unlawful. *See United States v. Pang*, 362 F.3d 187 (9th Cir. 2004).

c. It is a felony under 31 U.S.C. Section 5324 (a)(1) and (d) to cause or attempt to cause a financial institution to fail to file a CTR.   This provision encompasses multiple transactions occurring at the same financial institution, or different branches of the same financial institution, on the same business day.   In the case of multiple transactions in one day which aggregate above the $10,000 CTR threshold which the bank knows are by or on behalf of any person, the multiple transactions are treated as one transaction under 31 C.F.R. § 103.22(c)(2), thereby triggering the bank's obligation to file a CTR. Thus, an individual who, with the intent to evade the CTR reporting requirement deposits $5,000 cash into an account at Bank of America in the afternoon, and then another $5,000 in cash into a different account, but the same owner's account at Bank of America in same

afternoon, but different branch location, has violated Section 5324(a)(1).

d. I know from my experience and training that such "structuring" of cash transactions is a frequent practice among fraud suspects, drug traffickers, money launderers, tax evaders and other criminals who seek to avoid law enforcement scrutiny of large cash transactions. As described below, in the course of this investigation, I have uncovered numerous instances involving the structuring of cash deposits.

66. I obtained bank records from Bank of America and conducted a combined bank account analysis of LERNER's joint account (ending in 9731), his wife's account (ending in 4219), and his business account (ending in 3068) all held at Bank of America for the period between on or about January 1, 2010 and one or about January 31, 2015.

a. These records consisted of the signature cards, statements of account, and deposited items for both checking accounts.

b. A combined cash deposit analysis was conducted on the Bank of America accounts of LERNER which included joint checking (ending in 9731) and Rose's account (ending in 4219) from on or about December 8, 2010 through on or about December 15, 2010. After these cash deposits, LERNER wrote checks for his own benefit out of the joint account, paying his attorney on one occasion and a title company on another.

c. This analysis detailed the structuring of currency deposits and the splitting of structured currency deposits between the two checking accounts as described below.

d. The following analysis is a summary of the currency deposits and the split currency deposits between December 8, 2010 and December 15,

2010 made into LERNER's Bank of America checking accounts. This analysis includes the date and time of deposit, the account the currency was deposited into, the location of the bank where the currency was deposited, and the amount of the currency deposited:

| Bank of America Account # | Date | Time | Branch (Michigan) | Amount | |
|---|---|---|---|---|---|
| 6412244219 (Wife's account) | 12/08/2010 | 11:14 | Hutton Street (Teller No. 005) | 5,000.00 | |
| 6681349731 (Joint) | 12/08/2010 | 11:28 | Northville Township (Teller No. 001) | 5,000.00 | |
| 6681349731 (Joint) | 12/10/2010 | 14:29 | Hutton Street (Teller No. 003) | 5,000.00 | |
| 6412244219 (Wife's account) | 12/10/2010 | 14:41 | Northville Township (Teller No. 004) | 5,000.00 | |
| 6412244219 (Wife's account) | 12/14/2010 | 11:49 | Hutton Street (Teller No. 004) | 5,000.00 | |
| 6681349731 (Joint) | 12/14/2010 | 12:07 | Northville Township (Teller No. 006) | 5,000.00 | |
| 6681349731 (Joint) | 12/15/2010 | 11:11 | 6 Mile/Newburgh (Teller No. 006) | 5,000.00 | |
| 6412244219 (Wife's account) | 12/15/2010 | 15:25 | Northville Township (Teller No. 006) | 5,000.00 | |

   j. The pattern of facts show that all the cash deposits are under the $10,000 CTR reporting threshold and on December 8, 2010, December 10, 2010, and December 14, 2010 each deposit is made at a different branch located minutes apart from one another. Furthermore, the time between each deposit on each date was minutes apart.

67. In addition, LERNER made a number of cash deposits into his business account at GDPTR. The address on file for the GDPTR is the same address

22

as LERNER's office address on the Medicare enrollment documents (1678 S. Merriman Road, Westland, Michigan 48186):

| Bank of America Account # | Date | Time | Branch (Michigan) | Amount |
|---|---|---|---|---|
| 3068 | 4/12/2013 | 9:08 | Westland | 5,000.00 |
| 3068 | 4/15/2013 | 10:24 | Westland | 5,000.00 |
| 3068 | 4/16/2013 | 9:47 | Westland | 5,000.00 |
| 3068 | 4/17/2013 | 9:17 | Westland | 5,000.00 |
| 3068 | 4/18/2013 | 9:07 | Westland | 5,000.00 |
| 3068 | 4/19/2013 | 9:51 | Westland | 5,000.00 |
| 3068 | 4/22/2013 | 12:54 | Westland | 5,000.00 |
| 3068 | 4/23/2013 | 9:20 | Westland | 5,000.00 |
| 3068 | 4/24/2013 | 10:28 | Westland | 5,000.00 |
| 3068 | 4/25/2013 | 10:35 | Westland | 5,000.00 |
| 3068 | 4/26/2013 | 9:02 | Westland | 5,000.00 |
| 3068 | 4/29/2013 | 10:12 | Westland | 5,000.00 |
| 3068 | 4/30/2013 | 10:33 | Westland | 5,000.00 |
| 3068 | 5/2/2013 | 10:35 | 8 Mile/Livernois | 5,000.00 |
| 3068 | 5/3/2013 | 16:20 | Westland | 5,000.00 |
| 3068 | 5/6/2013 | 9:05 | Westland | 5,000.00 |
| 3068 | 5/15/2013 | 10:12 | Westland | 5,000.00 |

68. Based on my training and experience, as well as the totality of the investigation related to this matter, I believe this pattern of deposits establishes probable cause to believe that the depositor was aware of the $10,000 CTR filing requirement and was purposefully depositing amounts

23

less than $10,000 to avoid the filing requirement, and/or to attempt to cause the bank to fail to file a CTR.

69. Law enforcement officers obtained still video surveillance of the individual making the deposits at the different branch locations on the same day. The still video surveillance photograph received from Bank of America of the individual making the cash deposits appears to LERNER's wife.

*Money Laundering – BAZZI*

70. A review of APS' bank records reveals that BAZZI laundered proceeds of the Medicare Part D fraud at APS through a fake non-profit called La Maya Foundation. Form 990-PF, Returns of Private Foundation ("Form 990-PF") for La Maya Foundation list BAZZI as the president, his wife and son as the directors, and the address at BAZZI's home. BAZZI is the signatory on the La Maya Foundation bank accounts at Comerica, which is the same bank where BAZZI has his personal account and his APS account.

71. BAZZI had two accounts for La Maya Foundation at Comerica Bank, one account ending in #2244, and a second account that he opened in April 2010 ending in #4366. On or about February 17, 2010, BAZZI wrote a $150,000 check from his APS bank account to the La Maya account ending in #2244. On or about April 28, 2010, he made the first deposit into the new La Maya Foundation account ending in #4366, by transferring $50,000 from the APS account and writing a $50,000 check from the previous La Maya Foundation account ending in #2244. There were no outgoing deposits from the La Maya Foundation bank account ending in #4366 until on or about January 27, 2011, when BAZZI wrote an $80,000 check from the La Maya Foundation bank account back to APS. That same day, BAZZI also wrote a $20,000 check from the APS bank account to his personal bank account.

24

That cycle of money from APS to the La Maya Foundation accounts and then to BAZZI's personal account is illustrated below:

| Approximate Date | Financial Transaction |
| --- | --- |
| 2/17/10 | Check #5039 for $150,000 from APS account ending in #2726 to La Maya Foundation account ending in #2244. |
| 4/28/10 | $50,000 transfer from La Maya Foundation account ending in #2244 to into La Maya Foundation account #4366 |
| 4/28/10 | Check #5067 for $50,000 from APS account ending in #2726 to La Maya Foundation account ending in #4366. |
| 1/27/11 | Check #9697 from La Maya Foundation account ending in x4366 for $80,000 to APS account ending in x2726 |
| 1/27/11 | Check #6005 from APS account ending in x2726 for $20,000 to BAZZI's personal checking account ending in x1249 |

## XI.   Conclusion

72.   Based on my training and experience and the facts presented herein, I respectfully submit there is probable cause to believe that LERNER violated Title 18 U.S.C. Section 1347 (health care fraud); Title 18, U.S.C. Section 1349 (health care fraud conspiracy); and Title 31, U.S.C. Section 5324(a)(3) (structuring) and that BAZZI violated Title 18 U.S.C. Section 1347 (health care fraud); Title 18, U.S.C. Section 1349 (health care fraud conspiracy); and Title 18 U.S.C. Section 1956 (money laundering).

73.   As such, I respectfully request that an arrest warrant be issued for LERNER and BAZZI.

## XII.   Request for Sealing

74.   The criminal investigation regarding LERNER and BAZZI is continuing. A number of additional interviews, subpoenas, and possibly grand jury

25

testimony and search warrants, are contemplated in the very near future. Disclosure of the contents of this affidavit at this time would seriously impede the continuing investigation and prosecution by disclosing the details of the Government's investigation, which potentially would cause target(s)/subject(s) of the investigation to flee, destroy evidence, or intimidate and attempt to corruptly influence potential witnesses in the case. Such activity would seriously impede the investigation and prosecution. Accordingly, the Court is respectfully requested to issue an order sealing this search warrant application and affidavit until further order of this Court.

Respectfully submitted,

Steven Warren

HHS-OIG-OI Special Agent

Sworn to and subscribed to before me this _17_ day of June, 2015.

United States Magistrate Judge

Detroit, Michigan

26